# Expert Report of
# Kristen M. Zgoba, Ph.D.
# Associate Professor
# Florida International University (FIU)
# Miami, FL 33199

**Dated: April 22, 2024**

I, Kristen M. Zgoba, Ph.D., certify that:

Education and Experience

I received my Ph.D. in criminology from Rutgers University, the State University of New Jersey, and I am an Associate Professor at Florida International University (FIU) in Miami, Florida. I teach courses on sexual offending, corrections, research methods, and statistics. Prior to coming to FIU, I was the Supervisor of Research at the New Jersey Department of Corrections from 2004 until 2018. Throughout the course of my career, I have studied correctional populations, policy evaluation, violence, and recidivism; however, my main focus has been on sexual offending behavior and legislation. I am the author of over 65 peer-reviewed publications, with the vast majority relating to sexual offending. I have qualified to testify as an expert in approximately fifteen proceedings involving individuals convicted of sexual offending (ICSOs). Additionally, I have been awarded two federal grants from the Department of Justice to study the efficacy of Megan's Law and the Adam Walsh Act (AWA). Over the last 15 years, I have been invited to present on the topic of sexual offending on approximately twenty occasions and have testified to the United States Sentencing Commission on failure to register (FTR) as an ICSO. My full curriculum vitae, which includes a list of all of my publications authored in the last twenty years and a list of all cases where I have testified as an expert in the last four years, is attached.

Executive Summary

- Recidivism – Empirical research does not support the belief that ICSOs re-offend at high rates. This includes both sexual and non-sexual recidivism. As evidenced by approximately two and a half decades of research, ICSOs generally demonstrate low levels of recidivism risk, particularly when compared to other types of criminal offenders. This risk is further decreased by strategies to manage sexual offending risk, particularly via sexual offense treatment and criminal justice supervision.

- Diminished Risk- ICSOs do not present enduring risk over the life course. Research has drawn attention to consistent declines in recidivism risk for those who remain offense free in the community. Similarly, individuals with histories of sexual crimes age out of crime as do other types of offenders.

- Effectiveness of Registries at Reducing Recidivism – Twenty-five years of research indicates that Sex Offender Registry and Notification (SORN) policies demonstrate no effect on recidivism. This finding holds important policy implications given the extensive adoption and net-widening of penalties related to SORN.

- Consequences of Registries – Many ICSOs experience unemployment, housing disruption, harassment, social alienation, and depression as a consequence of public SORN laws like Kentucky's. Research has demonstrated a correlation between these negative consequences and recidivism (both sexual and non-sexual), suggesting that laws focused on identifying people with past convictions to the public may be counterproductive and could potentially increase rather than decrease sexual offending.

>  Additionally, both research and news media demonstrates frequent public vigilantism toward ICSOs.

- Effectiveness of Internet Restrictions: There is no research of which I am aware that suggests placing restrictions on registrants' ability to use the internet in a lawful way impacts recidivism given the other findings in my report.

> I. Introduction

1. All information in this report is based upon publications and online research that are used by academicians and clinicians, my personal knowledge of the foundational work in the fields covered, or knowledge derived from my professional relationships, my own research, and the organizations with which I have worked or been affiliated. The conclusions and opinions are solely mine. Throughout this report, I provide key findings and conclusions from researchers and empirical scientists, myself included, regarding (1) the scientific understanding of sexual recidivism, (2) the manner by which risk decreases over time, (3) the lack of effectiveness of post-conviction measures like SORN laws at reducing recidivism, (4) incidence of harassment and vigilantism directed towards registrants, and (5) findings related to technologically facilitated sex offenses.

> II. Recidivism

2. At the center of the recidivism debate is the fundamental belief that sexual recidivism rates are high, higher than other types of offenders. However, this is a flawed belief and research does not support this belief. As evidenced by approximately two and a half decades of empirical research, ICSOs generally demonstrate low levels of recidivism risk, particularly when compared to other types of criminal offenders. This risk is further decreased by strategies to manage sexual offending risk, particularly via sexual offense treatment and criminal justice supervision. Below is a review of both historic and more recent research on sexual and non-sexual recidivism.

3. One of the earliest studies of recidivism concluded that ICSOs have a low rate of recidivism. It reviewed 42 studies and concluded that ICSOs have a relatively low rate of recidivism, < 12% (Furby, Weinrott, & Blackshaw, 1989). This meta-analysis has been considered a landmark analysis of sexual re-offense behavior and has been cited over 1,000 in academic and legal studies. Years later on a larger scale, Sample and Bray (2003, 2006) provided an analysis of a large sample of arrested adults who committed a total of nearly three million charges over a 5-year period. Their results suggested that while property offenders had the highest rate of recidivism after 5 years (38.8%), less than 7% of the ICSOs recidivated for a sex offense 5 years following their initial sex offense arrest. Furthermore, the ICSOs presented an even lower rate of general recidivism (45.1%) compared with most other offender types. These findings led Sample and Bray (2003, p. 76) to conclude that "based on rates of reoffending, sex offenders do not appear to be more dangerous than other criminal categories." Hanson and Morton-Bourgon (2004) also conducted a meta-analysis of 95 studies involving a combined sample of 31,216 ICSOs. The average sexual recidivism rate found was 13.7 percent and the

3

average overall recidivism rate was 36.9 percent, based on an average follow-up period of five to six years.

4. Also of relevance here, two studies were subsequently completed in New Jersey prisons. The first study examined ten-year sexual and non-sexual offense recidivism for ICSOs released from the general prison system and from the Adult Diagnostic & Treatment Center (ADTC).[1] Four hundred sixty ICSOs who were released from the ADTC in the years 1990, 1991, 1994 and 1995 were retrieved from records within the institution, while 250 ICSOs released from the general population in 1990 were examined (Zgoba, Sager &Witt, 2003). For both groups of individuals, the ten-year sexual offense reconviction rates were relatively low, lower than the community and media outlets perceive, 8.6% for the ADTC offenders and 12.7% for the general prison ICSOs (Zgoba et al., 2003).

5. A second study conducted years later used a sample of 550 cases released from NJ prisons. Holding time at risk constant, 9% of the sample had been re-arrested for a sex crime, representing about 19% of all the arrest charges in the sample. Additionally, 46% of the sample of ICSOs released from the ADTC and the general population had committed what would be referred to as a "general" re-offense, one that does not include sexual crimes (Zgoba, Witt, Dalessandro & Veysey, 2008). Similar to the study above, these rates were lower than often represented by the media or believed by communities.

6. <u>Decades of empirical research demonstrate that ICSOs have decreased levels of sexual and non-sexual recidivism, as compared to other types of criminal typologies. This difference is statistically, significantly lower. This recidivism is further decreased by sex offense treatment modalities and use of risk assessment tools.</u>

III. Diminished Risk

7. Research by Hanson, Harris, Letourneau, Helmus & Thornton, (2018) examined the testable assumption that individuals with a history of sexual crimes present an enduring risk for sexual recidivism. They modeled the long-term (25-year) risk of sexual recidivism in a large, combined sample (N= 7,000) and found that the likelihood of new sexual offenses declined the longer individuals with a history of sexual offending remain sexual offense-free in the community. This effect was found for all age groups and all initial risk levels. In terms of risk levels, declines were observed for ICSOs at all risk levels. The lowest risk individuals were below the desistance threshold[2] at time of release. Within 10 to 15 years, the vast majority of individuals with a history of sexual crime will be no more likely to commit a sexual crime than individuals who had been convicted of a nonsexual crime and who have never been previously convicted of a sexual crime (1% to 2% after 5 years). For individuals classified as below

---

[1] The ADTC is the New Jersey Department of Corrections Correctional Facility designated as the treatment center for individuals convicted of a sex offense who were found to be in need of sex offender-specific treatment.

[2] Hanson, et al. (2018), looked at the rate at which individuals released from prison with a prior history of non-sex offense convictions, committed a sex offense after release, what he called "out of the blue" sex offending. He found that rate to be approximately 2-3% after five years. Hanson noted that in criminology the ability of an ex-offender to desist from future criminal activity is called desistance. He uses the term "desistance threshold" to refer to the point at which the risk of committing a future sex offense is no different between individuals with a prior sex offense conviction and individuals with a prior non-sex offense conviction.

average, they crossed the desistance threshold between 3 and 6 years after release. For average risk offenders, they crossed it between 8 and 13 years, and for above average risk, it was between 16 and 18 years. For the highest risk offenders, their risk declines to desistance levels after 20 years, although precise estimates for this risk range are difficult to assert given the data available (there was only one sexual recidivist out of the 394 individuals followed between 20 and 25 years).

8. In 2019, a study conducted by the Bureau of Justice Assistance (BJA) examined re-offense patterns of ICSOs released from state prisons. BJA reported that the longer ICSOs went without being arrested after release, the less likely they were to be arrested during the 9-year follow-up period. While 13% of ICSOs were arrested following release for the first time in year 2, that constituted 18% of the 71% who were not arrested in year 1. For those not arrested by the end of year 2, 12% were arrested by the end of year 3. Nine percent of those not arrested in years 1 through 5 were arrested in year 6. In year 9, 4% of the released ICSOs who went 8 years without an arrest were arrested. Additionally, about 3 in 10 (29%) released ICSOs were arrested for any crime during their first year after release. About 1 in 5 (20%) were arrested during their fifth year after release, and nearly 1 in 6 (16%) were arrested during their ninth year. In all, less than half (49%) of released ICSOs were arrested for any crime within the first 3 years of release, while more than two-thirds (67%) were arrested for any crime within 9 years.

9. Most recently, Thornton, Hanson, Kelley and Mundt (2021) stated that while individuals with a history of sexual crimes are often viewed as a lifelong risk, their research has drawn attention to consistent declines in recidivism risk for those who remain offense free in the community. Because these declines are predictable, the researchers state that this is of practical value and evaluators can use the amount of time individuals have remained offense free to (a) extrapolate to lifetime recidivism rates from rates observed for shorter time periods, (b) estimate the risk of sexual recidivism for individuals whose current offense is nonsexual but who have a history of sexual offending, and (c) calculate yearly reductions in risk for individuals who remain offense free in the community. In addition to their practical utility for case-specific decision making, these estimates also provide researchers an objective, empirical method of quantifying the extent to which individuals have desisted from sexual crime.

10. Furthermore, similar to other types of crimes, age appears to be one of the strongest predictors of sexual and non-sexual recidivism. According to the 2019 BJA study, younger ICSOs (those age 24 or younger at the time of release) were more likely to be arrested for rape or sexual assault following release than older ICSOs (age 40 or older at the time of release). Nearly 10% (9.4%) of ICSOs aged 24 or younger at the time of their release were arrested for rape or sexual assault within 3 years of release, compared to 3.0% of those age 40 or older. About half of those age 24 or younger who were arrested within 3 years of release for rape or sexual assault were arrested in year-2 alone (4.6%). Overall, within 9 years of release, ICSOs aged 24 or younger were twice as likely to be arrested for rape or sexual assault (11.8%) as ICSOs aged 40 or older (5.9%). Harris and Hanson (2004) found that offenders over the age of 50 were also less likely to re-offend than younger offenders. Furthermore, in a recent analysis of sexual offense data retrieved from four states (New Jersey, Florida, Minnesota and South Carolina), increased age was found to be protective of future reoffending, regardless of whether it was

the age at which the offense occurred, age at sentencing, or age at release from incarceration. In general, risk for sexual re-offense decreased with advancing age, suggesting that longer durations of registration and online notification systems mandated in current federal policy may be unnecessary. ICSOs experience the 'aging-out phenomenon', similar to other types of criminals. As the population ages, risk decreases and individuals pose less threat to public safety. Lifetime presence on a registry or an online notification system may obscure the public's ability to distinguish those offenders who are most likely to reoffend, and thereby placing the community at a greater level of risk (Zgoba et al., 2016).

11. <u>In conclusion, ICSOs, do not present enduring risk of sexual offending across the lifespan. This risk is decreased both by the amount of time offense-free, as well as the age of the individual.</u>

IV. Effectiveness of SORN Laws With Respect to Public Safety

12. Over the last 25 years, sexual offense policies have increased in size and scope. One of the most popular policies is registration and notification. All states currently have some form of registry, but only 18 states have adopted the 2006 federal SORNA-based system because of the logistical and financial challenges it poses. SORNA is viewed by many states as an unfunded federal mandate because it imposes extensive obligations without providing corresponding resources. (States that do not implement SORNA lose ten percent of their federal Byrne Grant funding, a separate grant program that provides support for prosecutors and law enforcement.) The research that exists indicates that states and localities can expect to incur significant costs if they attempt to implement SORNA, which is one of the reasons for rejecting SORNA supplied by the many states that have not implemented it since 2006.

13. Research exploring the efficacy of SORN policies has focused primarily on individual states, with a small number of studies examining multiple state effects (NCJA- SOMAPI, 2017). Within this research, there exists little to no evidence of a SORN impact for either first-time sexual offending or reoffending (Adkins et al., 2000; Agan, 2011; Maddan et al., 2011; Sandler et al., 2008; Schram & Milloy, 1995; Vasquez et al., 2008; Zgoba et al., 2008; Zgoba et al., 2010; Zgoba et al., 2018). <u>It is important to note that over the course of twenty-five years of research on the topic, there is a consensus that SORN policies do not deter crime, do not lower recidivism and do not promote public safety (Zgoba & Mitchell, 2021). In fact, as documented below, research supports the notion that SORN policies may inadvertently increase the risk of recidivism, thereby decreasing public safety.</u>

V. Impact of SORN Laws on ICSOs

14. Collateral consequences are effects, both intended and unintended, arising from convictions. Examples of legal collateral consequences include being barred from certain employment, the loss of the right to possess a firearm, the inability to participate in political elections, and (as here) being placed on a registry of offenders. In addition, people with convictions face social collateral consequences, which typically vary in intensity, frequency, and certainty. These might include relationship and parenting problems, employment difficulties, harassment, ostracism, and feelings of shame and diminished self-worth.

6

15. According to Tewksbury (2007), collateral consequences are not unique to ICSOs. Because of SORN laws, however, ICSOs are more significantly affected by collateral consequences than other people with criminal records. The problems of re-entry commonly faced by other criminal offenders are greatly exacerbated for people who have committed sexual offenses when they are placed on a public online registry, and can remain on the registry for their entire lives.

16. The stigma of sexual offense registration and community notification is well documented, as are the ways in which SORN laws can impede community re-entry and adjustment. The research on collateral consequences has been established over the past twenty years and has demonstrated consistency in its findings. Research establishes ICSOs experience a range of negative consequences, and that these consequences are typically more negative than those experienced by other people with convictions. Although these collateral consequences are not universal and may vary in intensity and the degree to which they affect the short- and long-term experiences of offenders, they nonetheless have serious implications for individual offenders, their families, communities, and society. This is important because many of the consequences are also "triggers" or catalysts for recidivism, for example, the lack of employment and housing, or the instability of either (Maletzky, 1993; McGrath, 1991).

17. Several studies used surveys to document the experiences of ICSOs in general. More than one-half (54.7%) of a general sample of ICSOs in Kentucky reported losing a friend who found out they were on the registry, 47% were harassed in person, 45.3% lost or were denied a place to live, and 42% lost a job as a result of registration. Rural ISCOs generally experienced more negative consequences than those living in metropolitan areas. Focusing on the experiences of forty female ICSOs in Kentucky and Indiana, another study found that "a number of negative experiences stem from sexual offense registration." The most significant collateral consequences identified by women in the sample were the loss of a job (42.1%), the loss of a friend who learned of their registration (39.5%), in-person harassment (34.2%), the loss or denial of a place to live (31.6%), and rude treatment in public (31.6%) (Tewksbury, 2005).

18. Levenson and Cotter (2005) examined the collateral consequences of 183 ICSOs in Florida. They reported that the majority of the respondents in their study experienced negative psychological feelings that were directly related to registration. Using a methodology similar to that of earlier studies, the authors reported that 35% of their sample was "forced" to move because of their placement on the Florida public registry. Additionally, 27% said that they had lost their jobs because of their status as ICSOs, and 19% reported some form of harassment.

19. A similar study conducted in Kentucky provides an in-depth analysis of the experiences and perceptions of ICSOs through the use of qualitative in-person interviews (Tewksbury & Lees, 2006). They interviewed 22 ICSOs listed on the Kentucky sex offender registry and reported several primary types of collateral consequences, including employment difficulties, relationship problems, harassment, stigmatization, and persistent feelings of vulnerability. As one respondent in the study explained, "I know [the registry] is there to remind and punish, but it will always be like a roadblock in the way for those of us who wish to truly rehabilitate and

change their lives." This research found that these issues were experienced more intensely by ICSOs than has been found among other people with felony convictions. The study concluded that re-integration into society can be more difficult for ICSOs as a result of registration.

20. Similarly, Burchfield and Mingus (2008) reported on interviews with 23 ICSOs in Illinois. They found that ICSOs have less access to local social capital because of their status as ICSOs. More than one-third of their sample reported voluntary withdrawal from the community and a decrease in social interaction. ICSOs were also found to be generally fearful of community members learning of their registration and experienced feelings of stigmatization due to their registry listing. Most respondents (78%) reported that policy requirements for sex offender parolees "impeded their ability to reintegrate into community life."

21. Another study in New Jersey examined how ICSOs experience, respond to, and attribute stress regarding SORN policies, particularly a new ban on internet access. Drawing on survey data from a random sample of 107 ICSOs, responses show significant levels of stress, significant losses due to restrictions on internet access, and coping methods associated with higher and lower stress levels. The most significant loss reported by the sample related to employment search difficulties. Factors associated with increased levels of stress include using self-distraction for coping and not accepting the situation (Tewksbury & Zgoba, 2010).

22. Most recently, a study examined open-source news reports involving vigilantes who targeted individuals because of their status as an ICSO or their suspected involvement in a sex offense (Cubellis, Evans & Fera, 2019). The Sex Offender-Vigilante database includes 279 separate incidents of vigilantism against ICSOs, ranging from the dissemination of unsanctioned fliers to murder. Results indicate that the stigmatization that ICSOs experience is so pervasive that it extends even to individuals *suspected* of having committed a sexual offense. This is consistent with what many states report in local newspapers and has been examined previously by Prison Legal News (https://www.prisonlegalnews.org/news/2017/may/5/vigilantes-assault-rob-and-murder-registered-sex-offenders/)

23. In summary, it is well established that many ICSOs experience unemployment, housing disruption, harassment, vigilantism, and social alienation as a result of SORN laws (Cubellis et al., 2019; Levenson & Cotter, 2005; Levenson et al., 2007; Mercado et al., 2008; Mustaine et al. 2006; Socia, 2021; Tewksbury, 2005; Tewksbury & Lees, 2006; Tewksbury & Zgoba, 2010; Zevitz & Farkas, 2000). Some ICSOs also report that these negative consequences have affected other members of their households. Likewise, many ICSOs report depression and hopelessness (Jeglic, Mercado, & Levenson, 2011). <u>As a result, SORN laws may actually undermine public safety by exacerbating factors that are correlated with criminal recidivism, as shown below.</u>

V.   Effectiveness of Internet Restrictions for ICSOs

24. With most individuals now using the internet and social networking sites (SNSs) regularly, the public has become increasingly concerned about risks posed by those they define as online predators. In response, a limited number of states, such as Kentucky, have begun to pass laws that burden ICSOs' ability to use of the Internet, SNSs or any online identifiers upon release

back into the community. Kentucky's newly passed law requires anyone who is required to register and who has committed a criminal offense against a minor display their full legal name on any social media profile they operate. It is not limited to those individuals who, for example, used the internet or SNS who contacted the victim in their respective offenses. This is noteworthy because many of the state challenges that have been raised have focused on the broad application of the online laws. Of the handful of states that have adopted these restrictions, many have been successfully challenged in state level courts and in 2017 the U.S. Supreme Court struck down a North Carolina law that barred registered sex offenders from using social networking websites. The court ruled that the law unconstitutionally limited offenders' free speech rights. (Packingham v. North Carolina, Case No. 15–1194 (June 19, 2017).) Given the broad applicability of Kentucky's law, the generalized application across all sexual offenses is needlessly limiting and overly broad to deter any future criminal conduct and to protect the public.

25. While there are no studies that directly evaluate internet restrictions, from an empirical standpoint, there are a number of problems with the implementation of such broad policies, most notably the collateral consequences of limiting a staple of everyday life in a technologically dependent society. <u>Importantly, no research exists that demonstrates placing a limit on an individual's use of SNS will reduce sexual or non-sexual re-offending. However, to the contrary, all research has demonstrated that eroding personal liberties to the point of decreased function will have a deleterious effect on an individual's reentry into society.</u> These broad limitations, without empirical basis, incur collateral consequences regarding rehabilitation for individuals looking to rebuild their lives in a legal, supervised manner. In our increasingly digital age, it is almost impossible to carry out the daily tasks of life without use or with limited use of a computer or cell phone. Releasees are expected to secure steady employment, but employers and potential employees alike utilize online job research and communication resources related to job searches. People use SNS for a wide variety of legitimate reasons, such as finding a job, keeping in touch with friends, staying informed about world events, and voicing their opinions on a wide variety of topics. As the Supreme Court recognized in *Packingham*, "Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means of access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives."

26. The ease of online accessibility also creates a huge burden on law enforcement to monitor when both the public and private sectors offer online access so readily—nearly every public library, educational building, café, and cell phone all offer online capability.

27. With a lack of research indicating online limitations deter sexual crimes, it is questionable whether these restrictions truly make our communities safer or if they simply make it more difficult for ICSOs to reenter society and rehabilitate.

28. This finding is underscored by the research that does exist regarding the incidence of registrants' commission of subsequent sexual offenses. Overall, research indicates that the vast majority of all sex offenses that are reported to law enforcement and cleared by arrest—more than 95%—are attributable to someone without a prior sex offense conviction. (Sandler et al., 2008). In the online context, research that exists points to a similar finding that of all

9

technologically facilitated offenses against minors: 96% do not involve someone who has a past sex offense conviction (Wolak et al., 2009).

29. Finally, the structure of the law also seems to be of limited value at preventing further offenses. For example, use of the internet to solicit a minor by a registrant is already criminalized as a Class C felony in Kentucky. KRS § 510.155(7). If a registrant is undeterred by the prospect of committing a Class C felony, it appears unlikely that they would be otherwise deterred by the prospect of committing a Class A misdemeanor for not identifying themselves.

<u>Statement on Compensation</u>

I have charged a rate of $300/hour for writing this report.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

Date:  April 22, 2024

Kristen Zgoba, Ph.D.
Florida International University
Miami, FL 33199